# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2422

_____

| | | |
|---|---|---|
| Beverly Anderson, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Arkansas. |
| Dassault Aviation, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: January 16, 2004

Filed: March 4, 2004

_____

Before WOLLMAN, MORRIS SHEPPARD ARNOLD, and COLLOTON, Circuit
Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

This is a product liability suit brought by Beverly Anderson, a Michigan
resident, to recover for injuries that she suffered while working as a flight attendant
on a Dassault Falcon business jet owned by her employer, Amway Corporation. The
jet was on its descent into a Michigan airport when it underwent a series of pitch
oscillations, allegedly buffeting Ms. Anderson about in the aircraft and causing her
injuries. The jet was manufactured in France by Dassault Aviation, a French
corporation. Business jets manufactured by Dassault Aviation, which account for the
majority of the company's revenue, are sold under the trade name Falcon, and are

exclusively sold and leased in the western hemisphere by Dassault Falcon Jet Corporation, which is a wholly owned subsidiary of Dassault Aviation. (Dassault Aviation and various of its subsidiaries, including Dassault Falcon Jet, are known collectively as Dassault Aviation Group.) Dassault Falcon Jet bought the jet on which Ms. Anderson was injured from Dassault Aviation in France, and then flew the jet to Little Rock, Arkansas, where it completed the jet and sold and delivered it to Amway.

Ms. Anderson initially filed suit in the Western District of Michigan against Dassault Aviation, Dassault Falcon Jet, and Honeywell, Inc. (which manufactured the autopilot in the jet). The Michigan district court granted Dassault Aviation's motion to dismiss for lack of personal jurisdiction, leaving Ms. Anderson's action against Honeywell and Dassault Falcon Jet pending there. Ms. Anderson then re-filed the suit against Dassault Aviation in the Eastern District of Arkansas. The Arkansas district court granted Dassault Aviation's motion to dismiss for lack of personal jurisdiction, from which Ms. Anderson now appeals. We review the dismissal for lack of personal jurisdiction *de novo*. *See Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610, 612 (8th Cir. 1994), *cert. denied*, 513 U.S. 948 (1994). Because we conclude that Dassault Aviation has sufficient contacts with Arkansas to subject it to personal jurisdiction there consistent with due process, we reverse.

I.

In a diversity action, a federal court may assume jurisdiction over a nonresident defendant only if the requirements of the forum state's long-arm statute are satisfied and the exercise of jurisdiction comports with due process. *See Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996). Arkansas's long-arm statute, Ark. Code Ann. § 16-4-101, gives the state's courts personal jurisdiction over persons and claims "to the maximum extent permitted by the due process of law clause of the Fourteenth Amendment of the United States Constitution." The only

issue in this appeal is thus whether the due process clause permits an Arkansas court's assertion of personal jurisdiction over Dassault Aviation.

In order for an Arkansas court to assert personal jurisdiction over Dassault Aviation consistent with due process, Dassault Aviation must "have certain minimum contacts" with Arkansas "such that the maintenance of the suit does not offend ◄traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Dassault Aviation's contacts with Arkansas must be sufficient to cause it "reasonably [to] anticipate being haled into court there." *Worldwide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Whether due process is satisfied depends not only on the quantity of contacts that Dassault Aviation has with Arkansas, but also on the "quality and nature" of those contacts, *see International Shoe*, 326 U.S. at 319. In assessing the nature of the contacts between Dassault Aviation and Arkansas, appropriate circumstances to consider include the burden on Dassault Aviation of litigating the case in Arkansas, the interests of Arkansas in adjudicating the dispute, Ms. Anderson's interests in obtaining convenient and effective relief, "the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies." *See Falkirk Mining Co. v. Japan Steel Works, Ltd.*, 906 F.2d 369, 374 (8th Cir. 1990).

## II.

### A.

Dassault Aviation's contacts with Arkansas result, in large part, from its business relationship with Dassault Falcon Jet, which operates a large production site in Little Rock that completes Falcon jets to customers' specifications. The district court determined that Dassault Aviation itself was neither present nor doing business in Arkansas, and that Dassault Falcon Jet's activities there were relevant to the

jurisdictional inquiry only if Ms. Anderson could "pierce the corporate veil" and show that Dassault Aviation's wholly owned subsidiary was actually its "alter ego." Concluding that Dassault Aviation did not sufficiently control and dominate the affairs of Dassault Falcon Jet to allow Dassault Falcon Jet's corporate existence to be disregarded, the district court granted Dassault Aviation's motion to dismiss for lack of personal jurisdiction.

The district court relied on *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 645-47 (8th Cir. 2003), in which we held that a holding company which owned stock in various companies, including a title and guaranty company, was not subject to personal jurisdiction in Arkansas based on the title and guaranty company's Arkansas activities. Dassault Aviation contends that we established a bright-line rule in *Epps* under which, when asking whether assertion of personal jurisdiction over a parent corporation comports with due process, the activities of the parent's subsidiary must be entirely disregarded unless the subsidiary's corporate veil can be pierced under state law. We did note in *Epps* that the plaintiffs were unable to pierce the subsidiary's corporate veil. *See id.* at 650. But in reaching our conclusion that the holding company's "mere ownership of [the title and guaranty company] is too distant and limited a contact with Arkansas to justify subjecting it to the District Court's exercise of personal jurisdiction," *id.*, we also noted that the "circumstances in each case much be examined to determine whether a corporation through the activities of another corporation has subjected itself to jurisdiction in a state under its long arm statute," *id.* at 649 (internal quotations omitted).

We think that the district court placed undue reliance on the principle of piercing the corporate veil. Determining the propriety of jurisdiction at a particular place always involves applying principles of fairness and reasonableness to a distinct set of facts, and the determination is not readily amenable to rigid rules that can be applied across the entire spectrum of cases. In any event, this case is clearly

-4-

distinguishable from *Epps*, because, as discussed below, Dassault Aviation's contacts with Arkansas go well beyond "mere ownership" of Dassault Falcon Jet. We agree with Ms. Anderson that neither physical presence in Arkansas nor piercing Dassault Falcon Jet's corporate veil is required to establish the minimum contacts necessary for the exercise of personal jurisdiction in Arkansas. Dassault Aviation's establishment of a distribution system in Arkansas, and marketing its products there, are matters that we may appropriately consider in determining whether the assertion of personal jurisdiction in Arkansas comports with due process.

B.

We conclude that Dassault Aviation has sufficient contacts with Arkansas to support an Arkansas court's assertion of personal jurisdiction over it whether or not Dassault Falcon Jet is its alter ego. Dassault Aviation and Dassault Falcon Jet have a close, synergistic relationship that is not an abuse of the corporate organizational form, but is clearly relevant to the jurisdictional question. The majority of jets sold worldwide by Dassault Aviation fly in and out of Arkansas to be completed to the specifications of consumers at the Dassault Aviation Group's largest production site by Dassault Aviation's wholly owned subsidiary and exclusive distributor of business jets in the western hemisphere. We think that it is contrary to common sense to maintain that Dassault Aviation's nexus to the state of Arkansas is so minimal that it is not amenable to suit there.

Dassault Aviation benefits greatly from Dassault Falcon Jet's exclusive distribution of its business jets throughout the western hemisphere, and Dassault Aviation has a clear awareness of and interest in its subsidiary's substantial operations in Arkansas. Dassault Aviation states in its 2001 annual report that "*Dassault Aviation* has been present particularly in the US since the start of the 1970s through its specialized Falcon subsidiary – Dassault Falcon Jet – which has three offices in Teterboro (New Jersey), Little Rock (Arkansas) and Wilmington (Delaware). The

Group's largest production site is in Little Rock." (Emphasis added.) Thus, Dassault Aviation touts in its own annual report that its "presence" in the United States has been especially significant in the state of Arkansas.

A website operated and administered jointly by Dassault Aviation and Dassault Falcon Jet (www.dassaultfalcon.com) includes a "time line," which purportedly chronicles the companies' "fascinating cavalcade of milestones" and their "Tradition of Excellence." The two companies provide the following information in their 1995 entry: "Continuing the consolidation effort, Dassault Falcon Jet now completes all new Falcon business jets at its plant in Little Rock, where a major expansion will begin in 1996. ... Quality Little Rock completions are now standard for Falcon customers in both hemispheres." The 1998 entry states: "Major expansion brings Dassault Falcon Jet Little Rock to almost half a million square feet – and boosts the center's production capacity to over 60 new aircraft completions per year. Little Rock is now the main completion center for all Falcon jets worldwide." The time line also reports that the Little Rock facility by 1998 "employ[ed] more workers than any single Dassault Aviation plant in France."

The companies' website explains the role of the Little Rock completion center, stating that "Falcons are manufactured in France, then flown in 'green' condition to the completion center where optional avionics and a custom interior are installed, and the exterior is painted." Jets sold to customers by both Dassault Aviation and Dassault Falcon Jet are flown in and out of the Little Rock completion center. Dassault Aviation itself paid over $126 million to Dassault Falcon Jet in the seven years preceding the filing of this action for completions done in Little Rock to Falcon jets that Dassault Aviation then sold to other parties. The companies indicate their pride in the Arkansas facility and its importance to their success by noting on their website that the Little Rock completion center is "one of the best-equipped and most efficient facilities anywhere – the envy of the completion industry – another testament

-6-

to the Dassault Falcon passion." ("Dassault Falcon" is the name of the division of Dassault Aviation that specializes in Falcon business jets; Dassault Aviation's other division, called "Dassault Defense," focuses on military programs.)

Because the two companies have a closely intertwined business relationship, Dassault Aviation's nexus with Arkansas and the Little Rock completion center goes well beyond mere ownership of Dassault Falcon Jet stock. This is not a situation in which Dassault Aviation simply placed the jet at issue "into the stream of commerce" which fortuitously swept it into Arkansas. Dassault Aviation bought what is now Dassault Falcon Jet in 1994, and since then has consistently acted to consolidate the image and operations of the two companies. The companies acknowledge that as early as 1995 they were "[c]ontinuing the consolidation effort" by making "[q]uality Little Rock completions ... standard for Falcon customers in both hemispheres." In a 2001 press release, Dassault Falcon Jet, discussing the Dassault Aviation Group, states that "[g]roup synergy is viewed as an important key to competitiveness." The group is able to achieve such synergy, in part, because the directors of the two companies overlap: both the CEO and the President of Dassault Falcon Jet are also officers and directors of Dassault Aviation. (The CEO of Dassault Falcon Jet receives all of his compensation from Dassault Aviation.)

Both companies use the word "Dassault" in their name, and they utilize a common logo. As the head of the Dassault Falcon division of Dassault Aviation (who is also Dassault Falcon Jet's CEO) testified, the companies "unify the efforts of both Dassault Aviation and Dassault Falcon Jet to create this brand and logo image." As discussed above, the companies share a website. They also jointly put together a publication entitled "Falcon Operator Directory," which lists seventeen Dassault jets owned and operated by persons or companies in Arkansas. The directory also gives contact information for a "field service representative" in Little Rock who provides services and information to Falcon operators based in Arkansas, an "authorized

service center" for Falcon jets in Little Rock, and a designated salesperson for potential Arkansas customers. The two companies also jointly publish and disseminate publications entitled "Worldwide Customer Service" and "Falcon Operator Services Guide," both of which provide contact information for a representative in Arkansas, and a customer service newsletter entitled "Update," which includes Arkansas-related Falcon news. It is readily apparent from the jointly produced website and publications, and the similarities in names and logos, that the two companies utilize a unified marketing strategy. Part of this unified strategy includes highlighting the activities of the Little Rock completion center and marketing various Falcon jet services to Arkansas customers.

We have stated that "a foreign manufacturer that successfully employs one or two distributors to cover the United States intends to reap the benefit of sales in every state where those distributors market." *Clune v. Alimak AB*, 233 F.3d 538, 544 (8th Cir. 2000), *cert. denied*, 533 U.S. 929 (2001). Dassault Falcon Jet not only marketed and sold products in Arkansas, but it operated the Dassault Aviation Group's largest production facility there. We conclude that Dassault Aviation "purposefully directed its products to the United States," and specifically to Arkansas, where most Falcon jets are completed, "through the distribution system it set up in this country." *See id.* Dassault Aviation clearly intended to reap the benefits of Dassault Falcon Jet's substantial presence in Arkansas, as is made clear in the statements from its annual report and the website that it co-operates. Given the central importance of the Little Rock completion center to the success of Dassault Aviation's worldwide sales of business jets, and Arkansas's specific and identifiable role in Dassault Aviation's unified marketing endeavors with Dassault Falcon Jet, it would not violate traditional notions of fair play and substantial justice for an Arkansas court to assert personal jurisdiction in this action.

## C.

In addition to Dassault Aviation's substantial nexus with Arkansas and the Little Rock completion center, we note that other considerations here also support the exercise of personal jurisdiction in Arkansas. For one thing, we are not convinced that an Arkansas forum would be especially inconvenient for Dassault Aviation. Though the distance between France and Arkansas is substantial, we presume that Dassault Aviation has ready access to air transportation for conveniently making the trip. Arkansas contains one of the central hubs of the Dassault Aviation Group, and is already visited frequently by employees of Dassault Aviation (including the two officers common to both Dassault Falcon Jet and Dassault Aviation). Furthermore, Arkansas has a substantial interest in the matter to be litigated, as the safety of Falcon jets affects the state's consumers and workers who encounter Dassault Aviation's products. Though the injury did not occur in Arkansas, and Ms. Anderson is not an Arkansas resident, the jet at issue here was completed and delivered to its buyer in Arkansas, as are many other Falcon jets. Finally, Ms. Anderson likely has no other forum available to her in this country for her suit against Dassault Aviation. Her action was dismissed in Michigan (where the accident occurred), and Arkansas (where the jet was sold) seems to be the sole remaining logical and convenient place for the litigation to proceed.

## III.

In sum, the symbiotic relationship between Dassault Aviation and Dassault Falcon Jet, coupled with the acknowledged importance of Arkansas's production site and Falcon customers to both companies' success, leads us to conclude that an Arkansas court's assertion of jurisdiction over the instant action would be reasonable and fair. We therefore vacate the judgment of the district court and remand the cause for further proceedings.

_____